2020 IL App (2d) 190426-U
No. 2-19-0426
Order filed February 7, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| MICHAEL BRADLEY, individually and on behalf of a class of other similarly situated individuals, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 16-L-326 |
| | ) | |
| DIRECT AUTO INSURANCE COMPANY, | ) | Honorable |
| | ) | James R. Murphy, |
| Defendant-Appellee. | ) | Judge, Presiding. |

JUSTICE BRIDGES delivered the judgment of the court.
Justices Schostok and Hudson concurred in the judgment.

**ORDER**

¶ 1   *Held*: The circuit court did not abuse its discretion in denying insured's motion to stay insurer's motion for summary judgment. However, the circuit court erred in granting summary judgment in favor of insurer. Therefore, we affirmed in part, reversed in part, and remanded.

¶ 2   Plaintiff, Michael Bradley (Bradley), individually and on behalf of others similarly situated, appeals from the circuit court of Kane County's orders denying his motion to stay and granting summary judgment in favor of defendant, Direct Auto Insurance Company (Direct Auto), regarding his complaint asserting violations of the Consumer Fraud and Deceptive Business

Practices Act (Consumer Fraud Act) (815 ILCS 505/1 *et seq.* (West 2016)). Bradley argues on appeal that the circuit court erred in (1) denying his motion to stay Direct Auto's motion for summary judgment because it was a *Celotex*-type motion, and (2) granting summary judgment in favor of Direct Auto. For the following reasons, we affirm in part and reverse in part.

¶ 3                                      I. BACKGROUND

¶ 4     Bradley purchased an automobile insurance policy issued by Direct Auto in May 2015 to cover his 2014 Kia Forte. The insurance application asked if there were "any other cars in the household other than those listed on the application?" Bradley understood the term "household" to mean family members or dependents. Because he was not married, had no children, and owned no other vehicles, he answered the question in the negative. At the time he completed the insurance application, Bradley was renting a room in a house owned by Lewis Stonehouse. Stonehouse owned a 2007 GMC Yukon that was also garaged at the same address. Bradley did not consider Stonehouse to be part of his "household." Bradley did not intend to drive any vehicle other than his own, including Stonehouse's, nor did he intend for any other person to drive it.

¶ 5     Shortly after midnight on June 18, 2015, Bradley's vehicle was damaged in a collision while being driven by Devon Jayne, who was a friend of Stonehouse's daughter, Ashley. Bradley submitted a claim to Direct Auto and, in turn, Direct Auto sent correspondence to Bradley, Jayne, and other claimants that included a "report of accident" form for them to fill out. Direct Auto also sent correspondence to the Wheaton police department requesting a copy of the police report.

¶ 6     After receiving no response from either Bradley or Jayne, Direct Auto sent additional correspondence to them on July 31, 2015, stating that the claim was denied due to their failure to properly notify Direct Auto of the loss as required by the policy. Said correspondence indicated that Direct Auto would reconsider its decision if the requested information was received within 14

days. Within the 14-day period specified in the letter, Direct Auto received a partially completed report of accident form from Jayne.

¶ 7    On August 14, 2015, Bradley called Direct Auto to inquire as to the status of his claim, and he was informed that Direct Auto had hired an investigator to speak with him. The investigator, Al Krok, met with Bradley on August 26, 2015, wherein Krok obtained information related to the claim and had Bradley sign an "affidavit of non-permissive use of an automobile." The affidavit stated: "On 6/18/15, the insured went to sleep. His keys were on the counter. Devon wanted to go driving so Ashley took the insured's keys and took his 2014 Kia Forte for a ride. Devon was driving and Ashley was the passenger. The insured had no knowledge they took his vehicle as he was sleeping."

¶ 8    Direct Auto sent Bradley correspondence on September 1, 2015, stating that his policy was "null and void from inception due to a MATERIAL MISREPRESENTATION on [his] policy application." (Emphasis in original.) According to the letter, Bradley's failure to "disclose pertinent information *** materially affect[ed] the acceptance or rating and/or the exposure of the risk assumed by [Direct Auto]." The letter also quoted a portion of the terms of the insurance policy titled "fraud and misrepresentation," above which the words "[f]ailed to disclose all household vehicles" was written.

¶ 9    Individually and on behalf of others similarly situated, Bradley filed a single-count complaint against Direct Auto on June 24, 2016, asserting violations of the Consumer Fraud Act. Therein, he alleged as follows. The class consisted of former and current Direct Auto policy holders whose claims were improperly denied. As a business strategy, Direct Auto targets low-income customers by offering auto insurance at below-market rates. The insurance coverage provided by Direct Auto is illusory because it never intends to pay out claims and, as a standard

practice, it denies coverage to its policy holders. When an insured submits a claim, Direct Auto hires private investigators in hopes of uncovering information, such as a non-material misrepresentation by the insured, to support a denial of coverage. Said investigations are deceptive, unfair, not conducted in good faith, and done for the express purpose of denying coverage. Direct Auto routinely denies coverage with the knowledge that most of its customers are unable to afford legal representation to challenge its practice of denying claims. From 2013 to the filing date of the complaint, Bradley and other policy holders made claims for coverage that were wrongly denied by Direct Auto.

¶ 10    Bradley alleged that Direct Auto violated the Consumer Fraud Act because it engaged in unfair or deceptive acts or practices by: (1) representing to customers that its auto insurance was "affordable and easy to buy," without any mention of the coverage that it would provide; (2) offering auto insurance coverage even though Direct Auto never intended to pay many of the claims made by its insureds; (3) offering illusory auto insurance coverage; (4) improperly alleging that its insureds made misrepresentations on their applications for insurance; (5) arbitrarily rescinding policies without a factual or legal basis; (6) failing to reimburse its insured after wrongly rescinding the policies; and (7) falsely denying coverage knowing its policyholders could not afford to litigate the denial of their claims. He also asserted that Direct Auto intended for the class members, including plaintiff, to rely on its unfair acts or practices in purchasing its auto insurance policies and paying premiums, and that they suffered damages when their claims were wrongly denied.

¶ 11    As to his specific claim, Bradley alleged that he timely filed a claim after his Kia was damaged in a collision but, rather than investigate the accident or inspect his vehicle, Direct Auto sent a private investigator to his residence to ask him whether other individuals lived at his address.

Thereafter, Direct Auto refused to return his repeated phone calls. Bradley later received a letter from Direct Auto's claims manager, Michael Torello, stating that his policy was "null and void" based upon a material misrepresentation in his application for insurance, even though his application contained no material misrepresentation.

¶ 12    Direct Auto moved to dismiss pursuant to section 2-619(a)(9) of the Code of Civil Procedure (Code) (735 ILCS 5/2-619(a)(9) (West 2016)), arguing that it properly rescinded Bradley's insurance policy based upon a material misrepresentation. In the alternative, it argued that even if the policy was not properly rescinded, there was no coverage because Bradley's affidavit established that the vehicle was not being driven with his permission at the time of the collision and the ignition wiring was not altered. Specifically, the policy provided that no coverage would be provided if the loss was "due to theft if the keys to the automobile were left within the automobile or if evidence indicates the ignition wiring was not altered to allow the operation of the automobile without keys." It argued that because Bradley did not have a valid claim, he could not be the representative of the putative class such that judgment on the pleadings in favor of Direct Auto was warranted. Direct Auto attached numerous documents to the motion, including affidavits from Torello and Krok, the "affidavit of non-permissive use of an automobile" signed by Bradley and procured by Krok, and internal correspondence from Rosa Miranda, an employee in Direct Auto's underwriting department, stating that the failure to disclose other vehicles in the household was a "serious omission of the insured's policy application."

¶ 13    Torello averred as follows. He was the claims manager at Direct Auto, and he was familiar with the insurance policy issued to Bradley and his claim for coverage arising out of the accident. On the insurance application, Bradley answered "no" when he was asked if there were any other cars in the household other than those listed on the application. During its investigation of

Bradley's claim, Direct Auto learned that a 2007 GMC Yukon was owned by Stonehouse, who also lived at Bradley's address. Had Direct Auto known that Bradley lived with Stonehouse and that Stonehouse owned a 2007 GMC Yukon, it would not have issued the policy as it was issued. As a result of the material misrepresentation, Direct Auto rescinded the policy and returned Bradley's premium.

¶ 14    Krok averred as follows. He was engaged by Direct Auto to investigate Bradley's claim, and he interviewed Bradley at his residence on August 26, 2015. Bradley told him that he was renting a room from Stonehouse and that Stonehouse owned a 2007 GMC Yukon. He also spoke with Stonehouse, who confirmed the information provided by Bradley. He prepared the "affidavit of non-permissive use of an automobile" that Bradley signed.

¶ 15    Bradley responded to Direct Auto's motion to dismiss, arguing that Direct Auto failed to establish that he made a material misrepresentation in not listing his landlord's vehicle on his insurance application and that Direct Auto was precluded from raising the non-permissive use exclusion to deny coverage pursuant to the "mend-the-hold" doctrine. He also asserted that where an insured discloses an additional vehicle in the household, Direct Auto's underwriting procedure was to contact the insured to either add the vehicle to the policy or specifically exclude it from the policy. As such, he asserted that even if his answer to the "additional vehicles question" was inaccurate, it did not amount to a material misrepresentation.

¶ 16    On January 17, 2018, the circuit court denied Direct Auto's motion to dismiss, finding that there were material questions of fact concerning whether plaintiff's statement was false, whether it was made with the intent to deceive, and whether it materially affected the risk accepted by the insurer. The court also noted that the policy did not define the term "household." Concerning the Consumer Fraud Act, the court found that Direct Auto's argument attempted to negate the essential

elements of plaintiff's claim, rather than raised affirmative matter to defeat the claim. Finally, noting that Direct Auto elected to rescind the policy based on a purported material misrepresentation, the circuit court agreed with plaintiff that the "mend-the-hold" doctrine barred its alternative argument that it could have denied coverage under the non-permissive user terms contained in the policy.

¶ 17    On February 22, 2018, Direct Auto filed its answer to the complaint and a counterclaim seeking a declaration that the insurance policy was properly rescinded or, in the alternative, that the non-permissive use exclusion barred recovery because the loss was due to Bradley's failure to secure the keys to his vehicle.

¶ 18    Then, on March 5, 2018, Direct Auto filed a motion for summary judgment, arguing that affirmative evidence established that it did not violate the Consumer Fraud Act because there was no dispute of fact that it (1) thoroughly investigated the claim and properly denied it based on a material misrepresentation in Bradley's insurance application, and said conduct was not a deceptive act; and (2) made no misrepresentation to Bradley when he completed the insurance application because it issues policies only through insurance brokers rather than directly to customers. Direct Auto characterized Bradley's complaint as "nothing more than an unpled breach of contract claim dressed up as a violation of the [Consumer Fraud] Act."

¶ 19    In support of its motion for summary judgment, it relied heavily on affidavits from Torello and Miranda. Torello's affidavit was more robust than his prior affidavit that was attached to Direct Auto's motion to dismiss, in that it outlined the investigative steps it took in reviewing Bradley's claim. Torello averred that after its receipt of the accident form filled out by Jayne, Direct Auto ran a report to determine if Jayne had a valid driver's license at the time of the accident. It also ran a "LexisNexis report" and reviewed a previously run LexisNexis report, both of which

suggested that additional individuals lived at Bradley's address who were not disclosed on his insurance application and that another vehicle was being garaged there. On his application, Bradley was asked if there were "any other cars in the household other than those listed on the application," and Bradley answered "no." Direct Auto engaged Krok to investigate whether there was permissive use of the Kia at the time of the collision and whether there were individuals living or vehicles garaged at Bradley's address that he did not disclose on his application. Direct Auto received Krok's report on August 26, 2015. Based on Krok's findings that an additional resident lived at Bradley's address who owned a 2007 GMC Yukon, Direct Auto "would not have issued the policy in the manner in which it was issued." Specifically, had it known that a 2007 GMC Yukon was also garaged at Bradley's address, it would have raised Bradley's premium from $379 to $512—representing an increase of $133. It rescinded the policy and returned Bradley's premium. Direct Auto also concluded that there was no coverage because Jayne did not have Bradley's permission to operate his vehicle at the time of the accident, and Jayne was able to operate the vehicle without altering its wiring.

¶ 20    Direct Auto also attached the affidavit of Miranda, who averred as follows. She was Direct Auto's underwriting manager, and she was responsible for negotiating and administering agreements between Direct Auto and numerous auto insurance brokers. Direct Auto did not sell insurance directly to the public, nor did it target low-income customers. Direct Auto had no contact with customers prior to and at the time they complete an insurance application.

¶ 21    Krok's "claims investigation report," referenced in Torello's affidavit, was also attached to the motion. It stated "[t]he insured lives at the above address. He states he rents a room from the owner of the house, Lewis Stonehouse, who also lives there with his daughter, Ashley. ***

Lewis Stonehouse owns a 2007 Yukon. (Felicia Freeman moved out 3 years ago. Tracy Stonehouse left in 2004)."

¶ 22    Bradley filed a motion to stay Direct Auto's motion for summary judgment and, relying on our decision in *Jiotis v. Burr Ridge Park District*, 2014 IL App (2d) 121293, characterized Direct Auto's motion as a "*Celotex*-type" motion rather than a traditional one. Bradley argued that it would be premature for the court to rule on the motion until full discovery was completed. In the event the court denied the motion, Bradley requested an opportunity to file an affidavit pursuant to Illinois Supreme Court Rule 191(b) (eff. Jan 4, 2013) to conduct limited discovery.

¶ 23    In response, Direct Auto asserted that "full" discovery was unwarranted because its motion for summary judgment was a traditional motion rather than a *Celotex*-type motion and that Rule 191(b) applied. It argued that the core of its motion was that affirmative matter proved that Direct Auto "conducted a complete investigation of the alleged motor vehicle accident" and denied the claim based on facts learned during that investigation, as well as that "nothing in [Direct Auto's] conduct constitutes a violation of the Consumer Fraud Act." It also argued that its motion established that Direct Auto could not have made a misrepresentation to Bradley at the time of his insurance application because it marketed its policies through brokers rather than sold them directly to the public.

¶ 24    Bradley filed a reply in support of his motion to stay, arguing that even if Direct Auto performed a "complete investigation" of the accident and did not market insurance policies to the public, it would not affirmatively disprove his claim that Direct Auto violated the Consumer Fraud Act. He also noted that the summary judgment motion relied almost exclusively on Torello's affidavit, notwithstanding the fact that he lacked personal knowledge as to several assertions contained therein. He also argued that Torello's affidavit did not affirmatively prove that Direct

Auto properly handled Bradley's claim, nor did it refute Bradley's assertion that Direct Auto's business strategy called for it to deny Bradley's claim at the outset.

¶ 25 The circuit court denied Bradley's motion to stay, finding that Direct Auto's motion was a "traditional motion for [summary judgment]" and that Rule 191(b) applied. The court allowed Bradley 21 days to file an affidavit pursuant to Rule 191(b) if he needed discovery.

¶ 26 Bradley thereafter filed a Rule 191(b) affidavit, stating that he could not sufficiently respond to several factual assertions in Direct Auto's motion for summary judgment without deposing Torello and Miranda. Bradley stated his belief that, if sworn, Torello would testify that: (1) "garaging" a non-covered vehicle at the same address as an insured vehicle does not increase the risk of insuring an insured's vehicle; (2) Direct Auto would not have raised Bradley's premium if he did not use or insure Stonehouse's 2007 GMC Yukon; and (3) Direct Auto did not determine there was no coverage under the "non-permissive use exclusion" until after Bradley filed suit. Bradley believed that Miranda, if sworn, would testify that: (1) she was never employed by the insurance broker through which he purchased his insurance policy, and her knowledge of the broker's commission and business practices was not based on firsthand knowledge; (2) Direct Auto maintained a commercial website that was accessible to the public relating to its auto insurance policies; (3) Direct Auto advertises auto insurance to the public; and (4) Direct Auto encouraged brokers to sell its policies to the public.

¶ 27 The parties entered an agreed order on June 7, 2018, allowing Bradley to conduct limited discovery as set forth in his Rule 191(b) affidavit. Bradley thereafter deposed Miranda, who testified regarding, *inter alia*, Direct Auto's marketing practices and a contract between Direct Auto and the insurance broker Bradley procured his policy from, Insure on the Spot. Direct Auto declined Bradley's request for a copy of the contract between Direct Auto and Insure on the Spot,

arguing that it was not referenced in Bradley's Rule 191(b) affidavit. Bradley moved to compel production of the contract, arguing that it was relevant to Direct Auto's assertion that it made no misrepresentation to Bradley because it did not sell Bradley the policy, but rather, Insure on the Spot sold it. He also asserted that he was entitled to view the contract before responding to the motion for summary judgment. Over Direct Auto's objection, the circuit court ordered that the contract be tendered to Bradley.

¶ 28 Bradley responded to Direct Auto's motion for summary judgment on January 18, 2019, arguing that the alleged falsity of his answer to the "other household vehicles" question, whether the statement was intended to deceive, and whether the answer materially affected the risk accepted by Direct Auto, were all material questions of fact that precluded summary judgment. Bradley also argued that the answer of "no" was not a material misrepresentation because Torello conceded during his deposition that Direct Auto would have issued the policy even if Direct Auto had known about Stonehouse's 2007 GMC Yukon and that the presence of another car in the household would not have affected the risk of insuring Bradley's vehicle. He also argued that Direct Auto's stated basis for rescinding his insurance policy has been rejected by the appellate court in *Direct Auto Insurance Company v. Beltran*, 2013 IL App (1st) 121128, and *Direct Auto Insurance Co. v. Koziol*, 2018 IL App (1st) 171931, and that Direct Auto's conduct in seeking rescission of its insureds' policies based on non-material representations was unfair and deceptive under the Consumer Fraud Act.

¶ 29 The circuit court granted Direct Auto's motion for summary judgment in a written order on April 18, 2019. It listed the elements for a claim under the Consumer Fraud Act, which it stated were that (1) the defendant committed a deceptive act or practice; (2) the defendant intended the plaintiff to rely on the deception; and (3) the deception occurred in a course of conduct involving

trade or commerce. It found that "[t]here is no evidence to support the first and second elements." The circuit court also found that Bradley "had the opportunity to explore the issues raised by the motion for summary judgment in the depositions and[,] based on what has been presented following that discovery, there is an absence of evidence that the conduct of [Direct Auto] violated the [Consumer Fraud] Act." The court also noted that Bradley had "backed off on his claim that [Direct Auto's] violation of the [Consumer Fraud] Act is based upon the marketing of policies," but he instead focused on Direct Auto's "method of investigation." It found there was "nothing fraudulent or deceptive in the method of the investigation" that Direct Auto conducted. It also noted that while the rescission may have been wrongful as it was based on an "arguably non-material [mis]representation by the insured as to other vehicles in the household, [Direct Auto] did rescind the policy and that rescission was not a misrepresentation." Moreover, it concluded that there was "no evidence of a deceptive act by [Direct Auto] or an act intended by [it] to induce reliance by [Bradley]," and that there was "no evidence of a separate and independent tort, or other act" beyond a breach of contract that would support a claim under the Consumer Fraud Act. The circuit court also stated it did not reach the issue of the alleged non-permissive user, whether the "mend-the-hold doctrine" barred that argument, or the manner in which Jayne obtained the keys to Bradley's Kia, as they were unnecessary for deciding whether to grant Direct Auto's motion for summary judgment.

¶ 30    Direct Auto thereafter filed a motion to voluntarily dismiss its counterclaim, which the court granted on May 8, 2019, fully resolving the case. Bradley timely appealed.

¶ 31                                   II. ANALYSIS

¶ 32    Bradley argues on appeal that the circuit court erred in (1) denying his motion to stay Direct Auto's motion for summary judgment until after full discovery could be completed because it was

a *Celotex*-type motion; and in (2) granting summary judgment in favor of Direct Auto because there were genuine issues of material fact as to whether Direct Auto's conduct was deceptive and/or unfair under the Consumer Fraud Act. The parties agree that abuse of discretion is the applicable standard of review in evaluating whether the circuit court erred in denying Bradley's motion to stay (see *Jiotis*, 2014 IL App (2d) 121293, ¶ 22), and they likewise agree that *de novo* review applies to whether the circuit court erred in granting summary judgment in favor of Direct Auto (*Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992)). We address each issue in turn.

¶ 33    Bradley argues that the circuit court abused its discretion in denying his motion to stay Direct Auto's motion for summary judgment because it was a *Celotex*-type motion and he should have been allowed to conduct full discovery before having to respond to it. In support of his *Celotex*-type characterization, Bradley asserts that Direct Auto's motion did not raise any affirmative matter but was instead predicated on an alleged "lack of evidence" or "inability" to prove the elements of his case. He points to several lines included in the motion, such as "[p]laintiff *can establish none of the elements* of a claim for a violation of the [Consumer Fraud] Act," and "[t]here is *no evidence* to support that the investigation was improper or that Direct [Auto] engaged in any deceptive act or practice." (Emphases added.) Moreover, Bradley points out that the circuit court entered summary judgment based on its finding that there was "*no evidence* to support the first and second elements of a violation of the [Consumer Fraud] Act," notwithstanding the circuit court's prior finding that the motion was a "traditional" motion. (Emphasis added.) Relying on our decision in *Jiotis*, 2014 IL App (2d) 121293, he argues that he should have been allowed to discover those facts, if there were facts to be discovered, that would support his claim. He stresses that instead of allowing him a "full opportunity to conduct fact

discovery," the circuit court only permitted him to depose those individuals who provided affidavits in support of Direct Auto's motion, which he asserts was insufficient.

¶ 34    Direct Auto replies that the circuit court properly denied Bradley's motion to stay because its motion for summary judgment was a traditional motion, as opposed to a *Celotex*-type motion. In support, Direct Auto maintains that the exhibits attached to its motion conclusively proved that its investigation was not a deceitful act and that there was no deceptive act that Direct Auto intended Bradley to rely on.  It principally relies on Torello's affidavit, wherein he outlined the steps Direct Auto took in investigating Bradley's accident and insurance claim.  It also points to the other attached exhibits, including Krok's report, the partial accident report completed by Jayne, the LexisNexis reports suggesting additional individuals lived at Bradley's address and that an undisclosed vehicle was garaged there, and correspondence between Direct Auto and Bradley, Jayne, and the Wheaton police department.  In the alterative, Direct Auto asserts that even if its motion for summary judgment was a *Celotex*-type motion, the circuit court did not abuse its discretion in denying Bradley's motion to stay because Bradley had an adequate opportunity to conduct discovery in order to respond to it.

¶ 35    We find no abuse of discretion in the circuit court's denial of Bradley's motion to stay, and this conclusion is informed by our agreement with the circuit court that Direct Auto's motion for summary judgment was a traditional motion.  A defendant who moves for summary judgment may meet its initial burden of production in either of two recognized ways.  The first method is by affirmatively disproving an element of the nonmovant's case, which is commonly referred to as a "traditional" motion for summary judgment. *Jiotis*, 2014 IL App (2d) 121293, ¶ 25.  The second method was recognized by the United States Supreme Court in *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986), and consists of establishing that the nonmovant's evidence is insufficient to avoid

judgment as a matter of law. *Id.* In other words, a *Celotex*-type motion argues that a petitioner is unable to prove its case. *Department of Financial & Professional Regulation v. Walgreen Co.*, 2012 IL App (2d) 110452, ¶ 22. In order to prevail on a *Celotex*-type motion for summary judgment, "Illinois law requires more than merely pointing out the absence of evidence, without a supporting affidavit or other evidence." *Willett v. Cessna Aircraft Co.*, 366 Ill. App. 3d 360, 365 (2006). Instead, the defendant must demonstrate that the plaintiff cannot acquire sufficient evidence to make its case. *Id. at* 369. A *Celotex*-type motion is appropriate only when the nonmovant has had an adequate opportunity to conduct discovery. *Id.*

¶ 36 Bradley relies exclusively on our decision in *Jiotis*, 2014 IL App (2d) 121293, a case we find inapposite. There, the plaintiff filed a personal injury suit after the step stool he used to exit a hayride at a park district festival broke. *Id.* ¶ 4. The park district moved for summary judgment arguing, *inter alia*, that the plaintiff could not establish actual or constructive notice of a defect because it had not experienced prior problems with the step stool, that collapse of the stool did not constitute willful and wanton misconduct absent evidence of prior occurrences, and that the defendant was immune from liability. *Id.* ¶ 7. The motion was supported by an affidavit from the park district's executive director, who averred that, to his knowledge, the step stool was operating properly and showed no sign it would break prior to the plaintiff's accident. *Id.* ¶ 8. The operator of the ride, whose identity was unknown to the plaintiff, did not provide an affidavit. *Id.* ¶ 10.

¶ 37 The plaintiff filed a motion for discovery, noting that the defendant had not answered the written discovery that had already been served, nor had the defendant identified the operator of the hayride. *Id.* ¶ 11. The plaintiff also asserted he should not be required to comply with Rule 191(b) because the motion was premature and suggested only that he could not prove his case at that stage of the litigation. *Id.* The district resisted the motion, asserting that its summary judgment motion

was a "traditional," non-*Celotex* motion, because it relied on an affidavit. *Id.* ¶ 12. The trial court continued the case to allow additional discovery, ordered the defendants to answer the outstanding discovery, and ordered that the plaintiff be allowed to depose both the affiant and the hayride operator. *Id.* ¶ 14. The district was held in "friendly contempt" after it refused to produce the hayride operator. *Id.*

¶ 38 On appeal, we first underscored the importance of properly classifying a motion for summary judgment, because strict compliance with Rule 191(b)'s affidavit requirement, applicable when the nonmovant still requires discovery of material facts in order to respond, is not required when a defendant files a *Celotex*-type motion. *Id.* ¶¶ 25-26. Under Rule 191(b), the affiant must list the names of the persons whose affidavits it could not procure, explain why the affidavits could not be procured, and state what the affiant believes the person would testify to if sworn. We noted that compliance with Rule 191(b) would be "an impossible task without at least a reasonable amount of discovery" and that, in *Jiotis*, the plaintiff did not yet know the identity of the hayride operator. *Id.* ¶ 29.

¶ 39 The defendant argued on appeal that its summary judgment motion was a traditional motion, asserting that the plaintiff provided "no facts" to establish that the park district had notice of a defective condition. *Id.* ¶ 32. It further argued that the executive's affidavit affirmatively established that the park district did not have prior notice that the stool was defective, that it did not act willfully and wantonly in failing to prevent the plaintiff's accident, and that it was immune from liability. *Id.* ¶ 32-36. The plaintiff argued that the motion was a *Celotex*-type motion because, *inter alia*, the executive's affidavit did not establish that the hayride operator did not have prior notice or that the operator was immune from liability, and it likewise failed to address the hayride operator's conduct. *Id.* ¶¶ 38-40.

¶ 40     We held that the trial court properly exercised its discretion in continuing the motion for summary judgment and excepting strict compliance with Rule 191(b). *Id*. ¶ 44. We observed that the district's argument that the plaintiff could not prove that it had notice was typical of a *Celotex*-type motion and did not affirmatively rebut any element of the plaintiff's case. *Id*. We noted that, in order to do so, the affidavit would have had to address whether the hayride operator was on notice, which it did not. Instead, the affidavit impermissibly conflated the executive's knowledge and state of mind with that of the hayride operator. *Id*.

¶ 41     Here, unlike in *Jiotis*, Direct Auto's motion was premised on the attached evidence that, in its view, affirmatively disproved Bradley's allegations that its investigation and subsequent decision to rescind his insurance policy constituted a deceitful or unfair act or that it intended Bradley to rely on any misrepresentation. Bradley's emphasis on isolated sentences contained in Direct Auto's motion do not demonstrate that the motion was predicated upon an alleged weakness in his claim. Although the motion included references to a "lack of evidence" or "no evidence," the thrust of the motion was that the attached evidence affirmatively disproved Bradley's claim of a deceptive or unfair act upon which it intended Bradley to rely. Nowhere in *Jiotis* did we hold that such isolated statements contained in a motion were dispositive of the issue, but we instead looked to the substance of the motion. *Id*. ¶ 44.

¶ 42     Direct Auto's motion repeatedly cited to the attached exhibits in support of each factual assertion it argued defeated Bradley's claim, and it did not merely point to a lack of evidence. Most notably, it attached the affidavit of Torello, Direct Auto's claim manager. Therein, he identified each step Direct Auto took in investigating Bradley's claim, as well as identified what information it received, when it received that information, and what it did with that information. In ultimately granting Direct Auto's motion for summary judgment, the circuit court clearly relied

on this affidavit in finding that there was "nothing fraudulent or deceptive in the method of the investigation conducted by [Direct Auto]," nor did Bradley "rely on any misrepresentations made by [Krok]." Torello's affidavit did more than deny the essential elements of his claim, contrary to Bradley's argument. The motion was also similarly supported by other affirmative matters, such as Krok's report, the partially completed accident report filled out by Jayne, the LexisNexis reports, and numerous correspondence between Direct Auto and Bradley, Jayne, and the Wheaton police department.

¶ 43    Indeed, even if we agreed that Direct Auto's motion for summary judgment was a *Celotex*-type motion, we would still conclude that the circuit court did not abuse its discretion in denying Bradley's motion to stay. While "[a] *Celotex*-type motion is appropriate only when the nonmovant has had an adequate opportunity to conduct discovery" (*Willett*, 366 Ill. App. 3d at 369), the circuit court's decision to allow Bradley to depose the individuals who provided affidavits in support of Direct Auto's summary judgment motion provided him with such an opportunity. Bradley devotes the bulk of his brief to arguing that Direct Auto's motion was a *Celotex*-type motion such that he should have been entitled to conduct "full" and "complete" discovery. This position presupposes, without citation to any authority, that the filing of a *Celotex*-type motion for summary judgment prohibits the trial court from ruling on the motion until after discovery is completed. Our research has revealed no such prohibition. To the contrary, the nonmovant is due an "adequate opportunity" to conduct discovery necessary to respond to a *Celotex*-type motion. *Williams v. Covenant Medical Center*, 316 Ill. App. 3d 682, 692 (2000). Although Bradley asserts that it was "insufficient" that he was permitted to only take the depositions of the individuals who provided affidavits in support of the motion for summary judgment, he fails to identify what additional discovery he needed in order to respond to the motion. We also observe that, in granting Direct

Auto's motion for summary judgment, the circuit court specifically found that Bradley "had the opportunity to explore the issues raised in the motion for summary judgment" by way of the depositions.

¶ 44 Similarly, Bradley does not argue that he was prejudiced by the circuit court's finding that Rule 191(b) was applicable or in implicitly ruling that he was required to comply with it. In any event, we noted in *Jiotis* that if the park district had disclosed the identity of the hayride operator, the plaintiff could have and should have complied with Rule 191(b) if he needed more time for discovery before responding to the motion for summary judgment. *Jiotis*, 2014 IL App (2d) 121293, ¶ 49. Bradley was aware of the pertinent individuals employed by Direct Auto and had the opportunity to depose them. As Direct Auto correctly points out, Bradley could have requested additional information in the Rule 191(b) affidavit or filed additional motions to compel if he believed additional discovery was necessary. The circuit court did not abuse its discretion in denying Bradley's motion to stay.

¶ 45 Of course, our determination that Direct Auto's motion for summary judgment was premised on the affirmative evidence attached to the motion (as opposed to the weakness of Bradley's case) does not necessarily mean that Direct Auto has satisfied its burden of persuasion to establish its entitlement to judgment as a matter of law. Accordingly, we turn next to Bradley's argument that the circuit court erred in granting Direct Auto's motion for summary judgment.

¶ 46 Section 2-1005 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1005 (West 2018)) provides for summary judgment when the pleadings, depositions, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact such that the movant is entitled to judgment as a matter of law. *Steadfast Insurance Co. v. Caremark Rx, Inc.*, 359 Ill. App. 3d 749, 755 (2005). The court must construe these documents and exhibits strictly against

the moving party and liberally in favor of the nonmoving party. *Home Insurance Co. v. Cincinnati Insurance Co.*, 213 Ill. 2d 307, 315 (2004). The plaintiff is not required to prove his case at the summary judgment stage. Rather, in order to survive a motion for summary judgment, he must present a factual basis that would arguably entitle him to judgment. *Robidoux v. Oliphant*, 201 Ill. 2d 324, 335 (2002). Summary judgment is a drastic means of disposing of litigation and should be entered only when the right of the moving party is clear and free from doubt. *Gilbert v. Sycamore Municipal Hospital*, 156 Ill. 2d 511, 518 (1993). We review a trial court's grant of summary judgment *de novo*. *Outboard Marine Corp.*, 154 Ill. 2d at 102.

¶ 47     The Consumer Fraud Act is a regulatory and remedial statute that is intended to protect consumers, borrowers, and business persons against fraud, unfair methods of competition, and other unfair and deceptive business practices. *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 416-17 (2002). It makes it unlawful to engage in any "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact *** in the conduct of any trade or commerce." 815 ILCS 505/2 (West 2018). The Consumer Fraud Act is disjunctive, in that it declares as unlawful "unfair methods of competition and unfair *or* deceptive acts or practices." (Emphasis in original). *Pappas v. Pella Corp.*, 363 Ill. App. 3d 795, 804 (2006). To establish a violation under the Act, a plaintiff must establish: (1) a deceptive act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deception; (3) the occurrence of the deception during a course of conduct involving trade or commerce; and (4) the consumer fraud proximately caused the plaintiff's injury. *White v. Daimler Chrysler Corp.*, 368 Ill. App. 3d 278, 283 (2006). Alternatively, a plaintiff may recover against a defendant for an unfair practice

as opposed to deceptive conduct. *Aliano v. Ferriss*, 2013 IL App (1st) 120242, ¶ 25. A practice is unfair under the Consumer Fraud Act if it: (1) offends public policy; (2) is immoral, unethical, oppressive, or unscrupulous; and (3) causes substantial injury to consumers. *Robinson*, 201 Ill. 2d at 417-18 (citing *Federal Trade Comm'n v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244, n.5 (1972)). All three elements need not be satisfied to support a finding of unfairness under the Consumer Fraud Act. *Robinson*, 201 Ill. 2d at 418. Rather, a practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three. *Id*. at 418-19. A plaintiff may allege that conduct is unfair under the Consumer Fraud Act without alleging that the conduct is deceptive, and recovery may be had for unfair as well as deceptive conduct. *Id*. at 417.

¶ 48     Bradley argues that the circuit court erred in entering summary judgment in favor of Direct Auto because there were material questions of fact as to whether Direct Auto's conduct was unfair or deceptive under the Consumer Fraud Act. He points to the following conduct that he asserts is violative of the Act: (1) running LexisNexis reports on its policyholders, unbeknownst to them, in an attempt to invalidate their policies; (2) hiring private investigators to interrogate its policyholders in an effort to rescind their policies or deny their claims without informing them of the investigator's true role in the claims process; (3) preparing and instructing its policy holders to sign affidavits without disclosing that those affidavits would become the basis for denying their claims or rescinding their policies; (4) failing to keep its policyholders apprised of what was really going on when their claims were being processed; and (5) seeking rescission of its insured's policies based upon non-material misrepresentations, such as not listing a landlord's vehicle as part of the policyholder's "household vehicles" on their insurance application. He also highlights the circuit court's findings in denying Direct Auto's motion to dismiss that there were material

questions of fact regarding whether (1) Bradley's answer on the insurance application was false; (2) the answer was made with an intent to deceive; and (3) it materially affected the risk accepted by Direct Auto. Bradley argues that these fact questions were never resolved such that summary judgment was inappropriate. He also notes that the circuit court did not address whether Direct Auto's conduct was "unfair" under the Consumer Fraud Act, even though his complaint alleged both unfair and deceptive acts and practices, and he argues that the circuit court erred in finding that Direct Auto did not commit a deceptive or unfair act beyond a breach of contract that could support a claim under the Consumer Fraud Act.

¶ 49    We agree with Bradley that there are genuine issues of material fact as to whether Direct Auto's conduct in the instant matter was deceptive or unfair under the Consumer Fraud Act such that entry of summary judgment in favor of Direct Auto was improper. As noted by Direct Auto, the linchpin of Bradley's argument is that Direct Auto knew that his statement that there were no "other cars in the household other than those listed on the application" was not a material misrepresentation when it rescinded his policy. Bradley notes that Direct Auto's conduct in seeking rescission of policies based upon non-material representations contained in applications for insurance has been the subject of several appellate court decisions.

¶ 50    For example, in *Beltran*, 2013 IL App (1st) 121128, Direct Auto filed an action seeking a declaratory judgment arguing, *inter alia*, that Beltran's auto insurance policy was null and void because she made a material misrepresentation on her application for insurance. *Id*. ¶¶ 13, 18. The application listed Beltran as the applicant and identified her sex as "M," even though Beltran was female. *Id*. ¶ 5. The application indicated that Beltran had an international driver's license, but she stated in her deposition that she did not know how to drive. *Id*. Beltran owned a vehicle that she purchased intending that her brother, Mario, would use it to drive her to and from work.

*Id.* The application listed only Beltran as the driver of the vehicle and stated that there were no other drivers. *Id.*

¶ 51  After Mario was involved in a collision while driving Beltran's vehicle, Direct Auto rescinded the insurance policy, returned Beltran's premium, and filed a complaint for declaratory judgment. Therein, it asserted that Beltran made material misrepresentations on her application such that there was no coverage for the accident (*id.* ¶ 13) and alleged that she "intentionally misled [it] as to the other drivers in her residence." It further alleged that, had it known the vehicle was operated by drivers other than Beltran, "said information would have materially affected [Direct Auto's] decision to issue the *** policy." *Id.* ¶ 17. The trial court granted summary judgment finding coverage (*id.* ¶ 1) and denied Direct Auto's motion to reconsider, reasoning that Beltran made no intentional misrepresentation and there was one licensed, male driver at Beltran's residence at the time of the application (*id.* ¶ 35). The trial court also noted that there was no evidence indicating that insuring Mario would have negatively affected Direct Auto's risk, such as a negative driving record. *Id.* ¶ 39.

¶ 52  The appellate court affirmed, finding that Beltran did not make a false statement on her application regarding additional drivers because her unrebutted testimony established that she was not a licensed driver and did not operate the vehicle. *Id.* ¶ 50. Therefore, the number of drivers covered under the policy was the same as the number of drivers disclosed by Beltran: one. *Id.* The discrepancy was only in the name of the insured driver, noting that the application stated that the driver was male. *Id.* ¶ 51. In other words, although the application stated that only Beltran would drive the vehicle, the fact that the true driver was Mario did not increase the risk Direct Auto insured against because the number of drivers disclosed on the insurance application was accurate and there was no misrepresentation that substantially increased the chances of the events

insured against. *Id*. ¶ 62. There was also no showing that Beltran intentionally misrepresented the facts, and the court noted the policy should have been classified as a non-owned vehicle policy with an increase in premium. *Id*. In so holding, the *Beltran* court distinguished Direct Auto's cases by pointing out that the misrepresentations in those cases were material because the insurers would have denied coverage had the insureds not made the misrepresentations. *Id*. ¶ 60. See *Styzinski v. United Security Life Insurance Co. of Illinois*, 332 Ill. App. 3d 417 (2002) (affirming summary judgment in favor of insurer where insurer would have excluded coverage for motorcycle injuries had the insured, who was injured in a motorcycle accident, disclosed that he repaired and test drove approximately one dozen motorcycles per year) and *Northern Life Insurance Co. v. Ippolito Real Estate Partnership*, 234 Ill. App. 3d 792 (1992) (finding the insured materially misrepresented the condition of his health on his life insurance application where he stated he was in good health and did not disclose that he had AIDS). The *Beltran* court noted that Direct Auto stated only that it would not have issued the policy *as written*, in that the premium *would have been* higher, and it could not argue that it would have found Beltran uninsurable had it known she lived with Mario. (Emphasis in original.) *Id*. ¶ 60. The court also distinguished *Ratliff v. Safeway Insurance Co*., 257 Ill. App. 3d 281, 288 (1993) (holding "the nondisclosure of a 20-year-old driver residing in the same household is a misrepresentation that materially affects the risk assumed by the insurer" because the insurer certainly would have reassessed its risk had the insured's son as a driver, his age, and the amount he drove the vehicle, been disclosed). The *Beltran* court noted that, in *Ratliff*, the risk insured against increased because the vehicle was regularly driven by twice as many people as were listed on the policy. *Id*. ¶ 61.

¶ 53 In both *Beltran* and the instant matter, Direct Auto argued only that it would not have issued the policy *as written* because it would have charged the insured a higher premium.

However, *Beltran,* as subsequently confirmed by *Koziol*, 2018 IL App (1st) 171931, ¶46, makes clear that a mere increase in premium, standing alone, without any evidence of an increased risk to the insurer, is insufficient to justify rescission of an automobile insurance policy. Importantly, Torello did not aver that Direct Auto would have denied Bradley's application for insurance had he disclosed the existence of his landlord's 2007 GMC Yukon, nor did he provide any evidence to establish that the existence of the Yukon increased the risk of the events insured against. Torello averred only that Direct Auto would have increased Bradley's premium by $133 had the Yukon been disclosed. While Direct Auto argues on appeal that "the increased risk is due to the existence of a second vehicle in the household, to which [it] has provided uncontroverted evidence that the risk increased, such that Bradley would have been required to pay a higher premium," this argument is circular. In essence, it argues that "the existence of a second vehicle in the household" increased the risk of the events insured against because "Bradley would have been required to pay a higher premium [due to the existence of a second vehicle in the household]." The explanation provided by Torello in support of Direct Auto's decision to rescind Bradley's insurance policy— namely a higher premium, without evidence of an increased risk to the insurer—was the same explanation rejected by the court in *Beltran*. See *Koziol*, 2018 IL App (1st) 171931, ¶¶ 45-46 (noting "[t]here was no evidence presented, except for the increased premium, as justification for the rescission, just like in *Beltran*. *** [A]n increase in premium, standing alone, without any actual evidence of an increased risk to the insurer, is insufficient to justify rescission of an automobile insurance policy").

¶ 54 Direct Auto stresses that, in *Beltran*, the answers provided on the insurance application were factually accurate, save for the name of the person insured. That is, in *Beltran*, one male driver was listed as the sole driver on the insurance application and only one male driver drove the

vehicle. Direct Auto contends that, in the instant matter, there were multiple vehicles at issue even though Bradley listed only his own vehicle on the application. Here, Direct Auto's argument distinguishing *Beltran* is unavailing because it presupposes that Bradley's answer of "no" to the question of whether there were "any other cars in the household other than those listed on the application" was false. Indeed, in denying Direct Auto's motion to dismiss, the circuit court noted that the application did not define the term "household," and it found that there were material questions of fact regarding whether Bradley's answer was false. In his response to Direct Auto's motion for summary judgment, Bradley averred that he rented a room at a house owned by Stonehouse and, at the time of his application, he did not seek to insure any vehicle other than his own, he did not drive or intend to insure Stonehouse's vehicle (which was insured by another insurance provider), and he understood "household" to mean dependents or family members. Moreover, based on Krok's report, Direct Auto was aware that Bradley was renting a room from Stonehouse at the time it rescinded his policy.

¶ 55    Even otherwise, if the circuit court had found that Stonehouse's 2007 GMC Yukon was another "car[] in the household," Direct Auto failed to provide any affirmative evidence that the presence of Stonehouse's vehicle in the same garage as Bradley's vehicle increased the risk of the events insured against or that Bradley intended to deceive Direct Auto. As such, the presence of an undisclosed vehicle in the household, as opposed to an undisclosed person, would not warrant a different result as was reached in *Beltran*. Torello's assertion that Direct Auto would have charged Bradley a $133 higher premium, standing alone, was insufficient to justify rescission. See *Beltran*, 2013 IL App (1st) 121126, ¶¶ 51-62; *Koziol*, 2018 IL App (1st) 171931, ¶ 45.

¶ 56    *Koziol* is also instructive, as the facts are squarely on point. There, an insured filed a breach of contract complaint against Direct Auto after it denied coverage for his automobile accident.

*Koziol*, 2018 IL App (1st) 171931, ¶ 4. Direct Auto sought a declaratory judgment that it did not owe coverage based on a purported material misrepresentation on Koziol's insurance application that was discovered during its investigation of the accident. *Id*. Specifically, Direct Auto learned that Koziol did not disclose the existence of a vehicle that was registered to, and kept at, his home address by his parents at the time he submitted his application. *Id*. ¶7. Like in the instant case, Koziol answered "no" to whether there were "[a]ny other cars in the household other than those listed on the application?" *Id*. The vehicle owned by Koziol's parents was insured by a different insurance company, and there was no evidence that Koziol drove it or that his parents drove his vehicle. *Id*. ¶ 13. Direct Auto moved for summary judgment and supported the motion with an affidavit from Miranda. *Id*. ¶ 8. She averred that the omitted vehicle "would have affected the rating or the acceptability of the risk," and Direct Auto would have charged Koziol a substantially higher premium had he disclosed his parent's vehicle. *Id*. Direct Auto argued that the misrepresentation allowed it to rescind the policy under the Insurance Code (215 ILCS 5/154) (West 2016)), *Id*. ¶ 9.

¶ 57    In denying Direct Auto's motion for summary judgment, the trial court applied the two-part test under the Insurance Code for determining whether a policy may be rescinded by an insurer. *Id*. ¶ 11. It noted that, under the test, the trial court had to determine (1) whether the statement was false and (2) whether Koziol intended to deceive Direct Auto on his insurance application or whether the statement materially affected the acceptance of the risk or hazard assumed by Direct Auto. *Id*. Importantly, the trial court observed that Miranda did not aver that Direct Auto would have rejected Koziol's insurance application had he disclosed his parents' vehicle—only that the premium would have been higher. The trial court reasoned that a higher premium, standing alone, did not make the misrepresentation material. *Id*. It also found that there

was no evidence that Koziol drove his parents' vehicle or that the vehicle substantially increased the chances of the events insured against. *Id*. At a minimum, there was a material issue of fact regarding whether Koziol intended to deceive Direct Auto when he omitted his parents' vehicle, and the record did not demonstrate that the misrepresentation was material. *Id*. ¶ 11. As such, the trial court applied *Beltran* and concluded that a premium increase, by itself, is not material and therefore insufficient to rescind an automobile insurance policy. *Id*. ¶¶ 11, 14. On appeal, Direct Auto argued that Koziol's misrepresentation was material such that it was entitled to rescind the policy because it would have increased his insurance premium by 35% had he disclosed his parents' vehicle. *Id*. ¶ 21.

¶ 58    The appellate court rejected this argument and affirmed, finding that the trial court properly applied its reasoning in *Beltran. Id.* ¶ 45. Applying *Beltran*, the court held that "an increase in premium, standing alone, without any actual evidence of an increased risk to the insurer, is insufficient to justify rescission of an automobile insurance policy under section 5/154 of the [Insurance] Code." *Id*. ¶¶ 45-46. The court noted that Direct Auto presented no evidence of an actual increased risk, or that Koziol's parents drove his vehicle or that he drove theirs, nor was there evidence that Direct Auto would not have issued the policy if his parents' vehicle had been disclosed. *Id*. ¶ 45.

¶ 59    In the instant matter, Direct Auto does not argue that *Koziol* is distinguishable. Rather, it stresses that *Koziol* was decided after Direct Auto rescinded Bradley's policy and argues that it should not be considered in determining whether Direct Auto knew that the statement on Bradley's application was not a material misrepresentation. We are aware of no requirement that conduct must first be deemed improper by an appellate court before a plaintiff may prevail on a claim under the Consumer Fraud Act based on that same conduct. We also observe that Direct Auto's argument

all but concedes that its decision to rescind Bradley's policy was improper, and we note that the circuit court specifically found that "the rescission may have been wrongful, as being based on an arguably non-material representation by the insured as to other vehicles in the household."

¶ 60    In light of *Beltran* and *Koziol*, we agree with Bradley that there were material questions of fact as to whether Stonehouse's 2007 GMC Yukon was a "car[] in the household," whether Direct Auto believed in good faith that Bradley made a material misrepresentation on his application before it rescinded his insurance policy, and whether Direct Auto's conduct in the instant matter was deceptive or unfair under the Consumer Fraud Act.  While we are cognizant that neither *Beltran* nor *Koziol* involved the Consumer Fraud Act, their holdings nevertheless suggest that Direct Auto's decision to rescind Bradley's policy was improper and, in the absence of any evidence of an actual increased risk to Direct Auto, *Beltran* arguably should have put it on notice that Bradley's answer regarding "other cars in the household" was not a material misrepresentation such that its decision to rescind his policy was improper.  We also note that, in granting Direct Auto's motion for summary judgment, the trial court did not address whether Direct Auto's conduct was, as a matter of law, "not unfair" under the Consumer Fraud Act, notwithstanding Bradley's argument that Direct Auto engaged in unfair business practices, in addition to deceptive business practices, by rescinding policies without a factual or legal basis and with the knowledge that most of its policyholders could not afford to litigate the issue.  Again, the Consumer Fraud Act is disjunctive, as it prohibits "unfair methods of competition and unfair *or* deceptive acts or practices." (Emphasis in original). *Pappas*, 363 Ill. App. 3d at 804.

¶ 61    Finally, we are also unpersuaded by Direct Auto's argument that Bradley's complaint is nothing more than an unpled breach of contract claim masquerading as a violation of the Consumer Fraud Act.  It is well-established that the Consumer Fraud Act does not apply to every contract

dispute, nor was it intended to supplement every breach of contract claim with a redundant remedy. *Cook v. AAA Life Insurance Co.*, 2014 IL App (1st) 123700, ¶ 28. A breach of contract, without more, is insufficient to sustain a cause of action cognizable under the Consumer Fraud Act. *Falcon Associates, Inc., v. Cox*, 298 Ill. App. 3d 652, 661 (1998). Rather, claims under the Consumer Fraud Act must satisfy a "consumer nexus test," under which the alleged conduct must involve trade practices addressed to the market generally or otherwise implicate consumer protection rights. *Brody v. Finch University of Health Sciences/The Chicago Medical School*, 298 Ill. App. 3d 146, 158 (1998). Bradley's underlying complaint sufficiently alleged a nexus between Direct Auto's conduct and the market generally under the Consumer Fraud Act. As noted, Bradley alleged that Direct Auto violated the Consumer Fraud Act by, among other acts, offering auto insurance coverage to the public even though it never intended to pay many of the claims made by its insureds, offering illusory auto insurance coverage, improperly asserting that its insureds made misrepresentations on their applications for insurance, and rescinding policies without a legal basis and with the knowledge that its policyholders could not afford to litigate the dispute. These allegations are not specific to Bradley, but instead relate to Direct Auto's participation in the insurance market generally.

¶ 62                                III. CONCLUSION

¶ 63    For the foregoing reasons, we affirm the order denying Bradley's motion to stay but we reverse the summary judgment entered in favor of Direct Auto, and we remand for further proceedings.

¶ 64    Affirmed in part and reversed in part.

¶ 65    Cause remanded.